Welcome and good morning. It's a pleasure to be here in Seattle with my colleagues, Judge Smith and Judge Kristen. We have one case set today, and it is the case of Joseph Weldon Smith v. Renee Baker. If the parties are ready to proceed, you can come forward. Robert Fitzgerald You sound a little muffled to me. Can you pull the microphone up just a bit? Thank you very much. Your Honor, I'd like to address three issues this morning. First, the trial court violated Mr. Smith's right to self-representation. Second, Mr. Smith's death sentence rests on a legally invalid aggravating circumstance. And finally, penalty retrial counsel was ineffective for failing to investigate, develop, and present evidence of Mr. Smith's mental illness. Your Honor, Mr. Smith represented himself in his penalty retrial proceedings for three months before permitting appointed counsel to take over the full defense. After counsel's appointment, Mr. Smith sat in his cell for weeks and never visited Smith. So, Smith filed a motion to return to pro se status. Ultimately, the trial court denied this motion, and the Nevada Supreme Court affirmed, concluding that Mr. Smith had engaged in dilatory conduct and disruptive acts during trial. This state court decision involved an unreasonable determination of the facts because it's not supported by the record. There is simply no evidence that... Your Honor, Mr. Smith did file a protective post-conviction petition in order to vindicate his rights from the guilt phase of trial. This was a timely post-conviction petition. And then after that, didn't he also agree to have Evans take over the full defense in the penalty phase? He did acquiesce to the court's insistence that counsel be appointed to take over the full defense. In a very short hearing, Mr. Smith said yes when asked whether he would let Evans take over the full defense. And then he moved to remove Evans and represent himself. Well, he didn't move to remove Evans, but rather he moved to return to pro se status. Well, he had to remove Evans in order to do that. Perhaps Evans could have stayed on as stand-by counsel. I mean, I'm not trying to trick you. I understand, Your Honor. Well, they denied the motion, and I guess I'm trying to figure out... You don't dispute that Mr. Smith was disruptive during the trial, do you? Years earlier, there was conduct at trial that was disruptive. So you're not disputing that? No, Your Honor, no. Okay then, what is my standard of review? Your standard of review is to look at the Nevada Supreme Court decision and whether applying the normal standards of appellate review, could that panel, an appellate panel, not reasonably reach the decisions on this factual determination. But just a minute. We're talking about a situation where I now have to say that the Nevada Supreme Court makes some kind of an error in this. The district court said Smith showed during trial an absolute disrespect for the orderly processes. After being granted the stand-by counsel on the very eve of trial when the court had set everything up, then Smith can find a way to get around, get counsel off the case. And Smith was trying to toy with the courts. How can I say that... I may even see that differently, but how can I say this is just totally... There's nothing in the record to support it. A defendants for rhetoric can only be denied if they engage in dilatory conduct when a request is timely, and if they have a dilatory intent... If it's not timely, that's to suggest that taking over this right to remove Evans and represent himself the night before is timely. Oh, Your Honor, that's focusing on the wrong hearing. Smith's motion to return to pro se status came eight months before the scheduled trial. Counsel, I'm going to interrupt, and I'm going to just tell you candidly, this is not the claim on which I have questions. It doesn't strike me as your strongest claim, and time is ticking, so it's certainly your time to use as you see fit. Thank you, Your Honor. I would just note that in the absence of any evidence of dilatory intent or obstructionist misconduct, the state court reached an unreasonable determination of the facts. I think your Faretta argument is really a tough one for you, but I have a lot of questions about claim eight. And that would be Mr. Smith's death sentence. The next claim I would turn to would be Mr. Smith's death sentence rests on an invalid... Stomberg issue? Yes, Your Honor. Okay. And the jury relied on a legally invalid theory in finding the single aggravating circumstance in this case. The state alleged murder at issue in this case involved torture, depravity of mind, or mutilation. The jury rejected torture. The Nevada Supreme Court invalidated depravity of mind, and there's grave doubt whether or not the jury was unanimous with respect to mutilation. Is it your contention that the Nevada Supreme Court engaged in any of the methods we identified in Valerio to cure the constitutional error? They did not engage in any harmless error. But we shouldn't decide that there's any close appellate scrutiny. Well, when they did not apply any harmless error, there was no close appellate scrutiny. Those are two different things. But I'm speaking of the three methods identified in Valerio to cure the error.  Walton, Clemens, Chapman. And your contention is that they didn't... I don't want to take all your time. Your contention is they didn't do any of those things. Well, they couldn't do Walton because Mr. Smith's sentencer was a jury. Right. And they didn't do Clemens because there was nothing else to weigh. There was no other aggravator. And there's no statement under Chapman that the error was harmless beyond a reasonable doubt. Correct, Your Honor. So the opposing counsel can respond to that. But I think in your outline you skip over that and said they didn't do any of those things. So we have a constitutional instruction, arguably, on mutilation. If you take it as a hypothetical that I find the mutilation instruction permissible and the other one, depravity, impermissible, unconstitutional, then we've got a Strongberg problem. Correct, Your Honor. And we're looking to... The next question is what standard do we use? And if you take it just as a hypothetical that I think Brecht applies, that that's the correct standard and it's not structural error, then can you do that analysis for me? Of course. I'd be happy to, Your Honor. Brecht analysis, this error was not harmless for three main reasons under Brecht because the error had a substantial influence on the jury's verdict. So I think what we're comparing is what a correctly instructed jury would have done given the evidence and whether there's any daylight between that and what this jury did do. Is that right? That's the test that's articulated in Valerio, assuming that a Walton analysis could apply. No, no, no, no, no, not Walton. We can't do Walton. I'm asking about Brecht. We have to figure out... The state has to give us a fair assurance, right, that there wasn't a substantial injurious effect. I'm asking what the comparison is. Isn't it between what this jury did do and what a properly instructed jury would have done? No, Your Honor. That is a test... Isn't that exactly what we said in Valerio? In Valerio, when moving to an alternative analysis, when assuming if a Walton analysis could apply... No, I'm not talking about Walton. We can't do Walton here. I understand that, Your Honor. And I guess my point, Your Honor, is that the test articulated in Valerio is one that assumes a Walton analysis could apply and is influenced by that. What this court should be looking at... You specifically said you couldn't do Walton in Valerio. I believe that the... That we're not doing de novo. Your Honor, I guess where I would say this court should look at what the test would be, would be looking into the United States Supreme Court's decisions in California v. Roy and Nieder, where they're addressing a missing element. And this is much more similar to this. That's a more stringent test that says an error can only be deemed harmless if there's overwhelming evidence of the missing element and it was not contested by the defense. Can you tell me, what would the instruction, in your view, look like? And what would be the outcome? We know from Smith, too, that a correct instruction would have had a limiting instruction that said that depravity of mind must require a finding of torture or mutilation... A finding or evidence of. It says both, doesn't it? The case was unclear about whether a finding is required or whether there's evidence of. Correct, Your Honor. There was evidence of mutilation in this case. Sufficiency of the evidence is not the appropriate test. This court... I'm not talking about sufficiency. I'm talking about the answer to Judge McGee's question, which is what should the instruction have been? In order to find depravity of mind, the jury must find evidence of torture or mutilation beyond the act of killing itself. Not a finding. Evidence of. You said it two different ways, and it matters. They must find mutilation. Didn't they find mutilation? They found... we have... The Supreme Court said they found mutilation. The Supreme Court said the evidence was sufficient to support a finding of mutilation. Just a minute. The majority said that the sentence was based on mutilation and found there was sufficient evidence of mutilation for the jury to find it beyond a reasonable doubt. Correct, Your Honor. And the dissent said, and that's the one I thought was important, that the sentence was based on mutilation. That is what the Nevada Supreme Court... we agree, Your Honor. Depravity of mind is completely removed. In fact, the sentence was based on mutilation. Why have we got a problem? The problem is that this court should have graved out whether or not the jury was unanimous with respect... But just a minute. The Supreme Court of Nevada said it was based on mutilation. The Supreme Court of Nevada did not wrestle with the issue... Well, just a minute, just a minute. The majority... that's why I'm having you look at it. The majority affirmed the sentence based on mutilation and found there was sufficient evidence of mutilation for the jury to find it beyond a reasonable doubt. And then the dissent said the sentence was totally based on mutilation and said, because it's totally based on mutilation, I'm going to challenge the fact that the instruction was wrong for mutilation. Did the Nevada Supreme Court find that they were unanimous in finding mutilation? They did not, Your Honor. That's the Stromberg problem, right? That is the Stromberg issue. Judge McGee was trying to ask a question. I was just... what Judge Smith is asking, that was based on the sufficiency of whether there was sufficient evidence for mutilation. Correct. Whether the jury could have found a mutilation as instructed. But they did not wrestle with the issue of the fact that the jury was not instructed that they had to be unanimous with respect to the means, with respect to the alternative theories, nor does the law necessarily require the jury to be unanimous with respect to that. So what would the instruction have looked like and what would have been the outcome? That's a good question. The instruction would have looked as it did with an accurate, limiting instruction requiring a finding of torture or mutilation beyond the act of killing itself. So when you say look as it did, I think that's instruction number... Well, hold on a second. Eleven. Yes, Your Honor. Okay. So let's look at number eleven if we could. So it's basically two sentences. The first sentence says, in order to find torture or mutilation of a victim, you must find that there was torture or mutilation beyond the act of killing itself. Yes. Would there be any change to that? No, Your Honor. Okay. So on the second sentence, it says in order to find depravity of mind, you must find serious and depraved physical abuse beyond the act of killing itself. What would be the change there? In order to find depravity of mind, you must find torture or mutilation beyond the act of killing itself. What that does is it constricts the type of conduct that constitutes depravity of mind. This is what the Nevada Supreme Court said in Smith 2. Right. You have to channel the jury's discussion. But that still gets us back to figuring out... But doesn't it also... I guess I'm sorry. No, go ahead. It says in order to find depravity of mind, you must find... You're saying it would now say torture or mutilation? Because the Nevada Supreme Court said that serious and depraved physical abuse is not consistent with depravity of mind. But that would be inserted there, correct? Correct, Your Honor. But it would still say serious and depraved physical abuse beyond the act of killing itself. Footnote 3 in Smith 2 says that serious and depraved physical abuse is not the proper standard for... is not the type of conduct that would permit a finding of depravity of mind. They say since Robbins, we've only upheld depravity of mind when there's been torture or mutilation. So they actually refined and narrow the instruction that would be permitted beyond what Robbins itself... And they said it two ways about what would be permissible. They said in some cases they've indicated that you'd have to have a finding of torture or mutilation. In other cases, they said we've only affirmed where there is evidence of torture or mutilation. Right? Correct, Your Honor. So then what would... Based on what you are submitting would be the new instruction, how is sentence number one different from sentence number two? And what would be the outcome in your view? Or what are you arguing? Why would that be a problem still? Sure. We don't read these instructions in isolation. There is also definitions for mutilation and definitions for torture. There was no definition for depraved physical abuse. And that was part of the issue that the Nevada Supreme Court had. What happens is when you have an instruction that requires a finding of depravity of mind to include torture or mutilation, it precludes the prosecutor from arguing, as he did in this case, that all he needed to show was that the victim suffered from blunt force trauma. He said any blunt force trauma. He did. He said any blunt force trauma. That's any type of blunt force trauma. Certainly a lesser degree than what torture or mutilation. That was an argument arguably incorrect. The trial court, I think in this case, made an incorrect read. Right? And we know that. Yes. But we still have to figure out, even if I give you that the mistake was made and the depravity instruction was unconstitutional, we have to figure out if there's direct error. And direct error asks whether there was a substantial influence on the verdict itself. Right. And right there, Valerio says, the question for us is whether the actual instruction had a substantial injurious effect or influence on the jury's verdict. And here's the important part. In comparison to what the verdict would have been if the narrowed instruction had been given. So I think what we're doing, and I'm really inviting you now for the third time to, okay, we know what the evidence was, right? And we know you've told us what you think the instruction should have been. And we know what the instruction actually was. And the actual instruction didn't narrow the jury's discretion in the way that you've described. Correct, Your Honor. Here's my problem. I think we have to look at the evidence that was presented. And the evidence that was presented told the jury very clearly, and the special verdict form told the jury, as to Christie, you only get to decide whether there was depravity. And then in the closing argument, that was explained by the prosecutor. Why do we make that distinction? And he explained very vividly because in Wendy's case, you gave it all three in the special verdict form because she was injured. The blunt force injuries were so much more traumatic. Well, I think that. So that conveyed, it seems to me, to the jury that depravity requires less. And that's wrong. That's my hypothetical. That's my read of the record. I think that was really visibly painted for the jury. So I think you have a very strong argument that it's an incorrect instruction that was conveyed to the jury about what the law requires. I don't think under Nevada law, depravity required less. But if the jury understood that, I still have to figure out whether that made a difference. If you told them the right instruction, given this evidence, the evidence that Wendy was so horribly beaten, how or why should I decide that it would have changed the outcome, please? Because when you're looking at that special verdict form and you see two checkboxes, one next to mutilation, one next to depravity of mind, there should be grave doubt whether or not the jury was unanimous in its finding of mutilation. I think I would not agree with your honors assessment of the evidence of mutilation in this case being anywhere near overwhelming. You didn't use that. I apologize. But there was substantial evidence. There may have been evidence. That's a fair point. But let me tell you so you can have a fair chance to respond. We know from the coroner's, because I've read all the testimony, and I'm sure you have too many times. We know from the medical examiner that her ear was nearly ripped off. We know there were 32 strikes. And we know that when the autopsy photo was finally shown, and it wasn't revealed until the closing argument, there was a gasp in the courtroom. A family member went out. There was an outcry. Basically, it was very, very moving. I can't see those photos in the record. They're photos that I can't see them. But it's clear to me in the record that there's a very powerful reaction. So I'd like to give you a chance to respond, please. There was a powerful reaction by a family member to those images. I would think that any time that a family member sees images of a deceased member, they may have a reaction. Your Honor, fair enough. But the point here is that the evidence of mutilation, the prosecutor did not spend a ton of time arguing mutilation in this case. They focused on the invalid depravity means. And that's where they spent the majority of their time discussing the case, painting Smith as an evil assailant and talking throughout about why depravity of mind applied to both Christie and Wendy. And we can be assured that the jury relied on depravity of mind with respect to Wendy, just as they did with Christie. Why are we sure of that, counsel? Because the crimes between Christie and Wendy were very similar. Both were struck with a hammer and then strangled. I want to make a point that Christie was 10. She didn't fight back. Wendy did. She was 20 years old. She fought back. She had a lot of defensive wounds. What about that? Any suggestion, Your Honor, that the jury was not unanimous with respect to depravity weighs even more in support of my argument that they were not unanimous with respect to mutilation. We simply cannot know what those checkmarks meant. And this court should be engraved out whether or not the jury was unanimous on that point for those reasons. Let me change this just a little bit. It seems to me that the Nevada Supreme Court said that the proper depravity instruction was would be defined depravity as torture, mutilation, or other serious or depraved physical abuse beyond the act of killing. So I'm trying to now move you just a little bit because I was listening very much to what Judge Merguia was asking you. The instruction here defined torture. The instruction here defined mutilation. The instruction here defined depravity as serious or depraved physical abuse beyond the act of killing. So since they defined all of those and the general instruction is that the depravity would have defined it as torture, mutilation, or other serious or depraved physical abuse, why is it not harmless error how the instructions defined it? Because, Your Honor, the Nevada Supreme Court has already identified that this instruction was inconsistent with Nevada law. Other serious or depraved physical abuse is not something that the jury was able to rely on. That's because the mistake was made. We're trying to figure out whether it mattered. And it does matter, Your Honor, because the evidence of mutilation in this case was not overwhelming. And it was a point that was contested by the defense. Defense counsel stood up and said this is not a case involving mutilation. There's just simply no evidence of that, argued against that finding. Wait, wait, wait. You think the prosecutor argued against mutilation? Did I misunderstand? Forgive me, Your Honor, I misspoke. It was defense counsel who argued against mutilation. But the prosecutor did not spend a ton of time addressing mutilation. Let me ask you a further question, just to make sure. Given the way it was defined, and given the way the Nevada Supreme Court had properly defined it before, why would a jury find depravity defined as serious or depraved physical abuse, not also find depravity when it said torture, mutilation, or other serious or depraved physical abuse? Because the prosecutor's argument to the jury, which was consistent with the instruction, permitted the jury to find other serious or depraved physical abuse as being any blunt force trauma. Any type of blunt force trauma could have satisfied that. But it's not any type of blunt trauma because it's got to be after a certain act of killing. I agree with you there, Your Honor. This conduct occurred contemporary with the act of killing itself. Well, nobody testified to that. The coroner said contemporary is in context. He very clearly talked about the hemorrhaging and that the blows came first. And, in fact, the state argued the blows were to subdue the victim so they could be strangled. Which would constitute one part of killing. If this court takes a look at the Rogers opinion, in Rogers' opinion, addressing a similar issue, using the test that Your Honor references, the victims were stabbed by a knife and then shot thereafter. And they concluded that that was a single act of killing. Let's go just a little bit again. I looked at what the majority said about mutilation. And I appreciate what the majority said, what their language suggests. I also appreciate that the dissent says the sentence was based on mutilation. No question. And, therefore, attack the mutilation instruction. Given that finding by the court, I'm trying to figure out why we aren't reviewing to see whether the Nevada Supreme Court made an unreasonable application of the facts. Your Honor, the dissent's view that this death sentence rests exclusively on mutilation was a result of the fact that the depravity had been struck away. I'm not sure that this court can read the dissent to say that the jury was unanimous with respect to that. Just a minute. I guess we'll argue about the language. But my worry about this is this. We've got the Nevada Supreme Court saying what the instruction should have said. We've got the instructions saying what they said. And if they'd have put in there torture, mutilation, or other serious depraved physical abuse, you wouldn't be here. But they did define torture. They did define mutilation correctly. They did define depravity as what they should have defined it, except adding torture or mutilation. And so I'm trying to figure out. And then the Nevada Supreme Court, addressing a total different issue, says, look, there's mutilation here. The dissent says it's obvious there's mutilation. I've got to attack the instruction. And then you say, well, that doesn't matter. The Nevada Supreme Court adopted a different approach when they were looking at Instruction 8 than they did in Instruction 10. I think if this court looks to the Evanchik opinion, in which it talks about the fact that a sufficiency of the evidence is not an appropriate test for applying harmless error, this court should be satisfied that the Nevada Supreme Court did not conduct harmless error. I appreciate the Nevada Supreme Court did not conduct the analysis they needed to for Instruction 8. But that's why we're on harmless error here. Because if they'd have done the exact thing they should have done with Instruction 8, they'd have taken the first approach, which was defined in the case that you and Judge Kristen have talked about. But when we look at what they did in Instruction 10, it seems obvious this could be harmless error. Your Honor, I think this just goes to a fundamental problem in this case, which is that there's no assurance the jury was unanimous with respect to mutilation. Moreover, there's no... But we're now on harmless error here. Correct, Your Honor, and this invalid means affected both the eligibility determination and the sentencing determination in this case. Let me ask you one other question, totally irrelevant. Is this particular claim procedurally barred? Was it barred? No, Your Honor. It was sent back, wasn't it, to the Nevada Supreme Court to think about it again? I'm not familiar with the procedure you're talking about, Your Honor. Well, there was a time. The Nevada Supreme Court decision held that Claim 8 was procedurally barred. And it looks like you never raised a Stromberg argument or prejudice argument pertaining to this whole depravity. I don't have any instruction at any point, so I think what Judge Smith is asking is why... And ours, fine. And Judge Smith is asking, and I'm curious, too, why isn't Claim 8 procedurally barred? This claim was presented and the legal theories were presented to the federal district court. Well, it's presented to the state court is where it has to be presented. That's what Judge McKee is asking, and it's in the exhaustion petition. So they decided it was late. It was included in the exhaustion petition, but Mr. Smith, in his opening brief to the Nevada Supreme Court following penalty retrial, challenged the depravity instruction and the way that the Nevada Supreme Court handled that creates this error that we have here now at this point. And after the second penalty phase, he presented it late. They decided it was procedurally barred because he presented it for the first time in his exhaustion petition. It was really the first time that Mr. Smith had an opportunity to present that claim because, again, this claim arises because the Nevada Supreme Court... I appreciate that. Then in the federal court, he raised it again. Sorry, the state raised a motion to dismiss. They did, Your Honor. Right? Yes. And the Nevada, sorry, the federal district court concluded that this claim had been raised on... It was not procedurally defaulted. It was not procedurally defaulted. Does it have any ability to do that when the state had already found it procedurally barred? Your Honor, well, that's not... I mean, the honest truth is it had been found procedurally barred. Now it comes back to the district court, and the district court says, well, it isn't procedurally barred because it was done before. But the honest truth is the district court had no ability to do that. If it was procedurally barred, they had to find a cause and prejudice to get around it. Unless the state waived the waiver. Where on the Ninth Circuit does the state argue procedural bar? And they do not, Your Honor. They don't argue this. The district court... Is this a legal issue? Can they... Do they... Have they waived it? That's the question, because that was going to be my next question. Judge Christens volunteered it. If it's procedurally barred, did the state waive it? And if it was waived, yes. Was it a legal question? Then it isn't necessarily waived. Your Honor, I'll let the state speak to whether or not, you know, what their position is on that. But at this point, the claim is properly before this court, and the state has not argued that it's procedurally defaulted. They take the claim up on the merits, and I suggest this court should do the same. Before your time is up, I did want to ask you about the Martinez claim. In your brief, you asked for a remand to the district court for an evidentiary hearing. I'm just curious, what evidence are you thinking would be submitted at this hearing that's not included here? Is there something we're missing here? Your Honor, at an evidentiary hearing, the experts who have provided declarations in this case could testify, and their credibility could be assessed by the judge in that case. We would be able to explore those opinions and have a more fuller hearing at that point. And it's important to note that the question of prejudice in that ineffective assistance counsel context is going to take a look at what a juror would have concluded from the evidence presented. Jurors do not read reports from experts, Your Honor. Jurors hear live testimony, and at least one judge should hear the live testimony from the experts in this case to determine what type of prejudice that would have happened. So it would be the existing reports or doctors who you've referred to in your submissions below, would there be additional medical, mental health evaluations? There would be the opportunity for that, Your Honor. At this point, Mr. Smith has presented evidence that establishes that he suffered from mental illness, delusional disorder that affected his judgment and thought process. That alone should satisfy any standard for receiving an evidentiary hearing at this point. The state can test those facts, the findings of the experts and the underlying factual predicate of those. Let me ask you, though. Based on Martina's analysis that we must conduct at this point, you must show that Mr. Smith was prejudiced by the first PCR counsel's failure to raise the IAC claim. Correct, Your Honor. Of the second penalty-faced counsel. We know the jury heard about some of the issues that may suggest a mental health issue. I think there were the letters that Mr. Smith left at the scene was also referenced. I guess taking this into consideration, how would the jury have decided differently if they knew that Mr. Smith was delusional of the grandiose type? Because it seems like that's the main thrust of the mental health evaluations, and I'm just trying to decide how would that have made a difference if the jury knew that Mr. Smith was delusional or had issues of grandiosity. That evidence establishes Mr. Smith's – in this proceeding, we've established Mr. Smith's mental illness for the very first time. The evidence – No diagnosis anywhere. No testing done, right? I'm sorry? Was there any testing and formal diagnosis made? There was a clinical interview that was held with Mr. Smith and Dr. Dudley. Was the answer no, there's no testing? But no testing occurred beyond that, Your Honor. But to your question as to what this would have done for the jury, they would have been able to put into context these crimes in this case, and it would have offered some kind of explanation. It was inherently mitigating evidence that the jury could have heard and did not hear because of counsel's deficient performance. I'm out of time. I appreciate the opportunity to speak with you about the case. I'll give you a few minutes for rebuttal. Thank you. That's my fault. May it please the Court, Jeffrey Conner from the Nevada Attorney General's Office on behalf of the respondents. I think I'll start jumping directly to your question about procedural default on Claim 8, Your Honor. We did not actually raise procedural default in the briefing as an alternative ground for this Court to affirm the judgment from below. So why haven't you waived it then? Well, that's what the case law suggests, Your Honor. But I would say that even if this Court determines that we have waived the procedural default issue, this Court is still under this Court's case law free to address that issue sui sponte. That looks a little weird, sui sponte. I mean, I looked at it. I said, it seems to me this is procedurally defaulted. It seems to me somebody should have argued it. And somebody didn't argue it. So now we're going to do it on the fly? Well, I mean, this Court's case law does allow for that. That's all I'm suggesting is that if the Court determines that it's waived but wants to find that it's procedurally defaulted, it can. Now, assuming it's not procedurally defaulted and this Court gets the merits, though, I think there's two— So what's your best argument if it's procedurally defaulted? What's my best argument that it's procedurally defaulted? No, what's your best argument given that it's procedurally defaulted? You didn't raise it. You want us to look at it on the fly. I'm trying to hear what your argument is. I'm not asking you to look at it sui sponte. I'm just saying this Court can do that. And, you know, if the Court wants to do that, I certainly wouldn't be opposed to that. I think, you know, there's certainly a ground for this Court to find that it is procedurally defaulted. What is that ground? That the theory that they're raising here is different than what was actually raised in— so to the extent this claim was not fairly presented in Smith 2, it was unexhausted. And then when it was presented in the subsequent state post-conviction proceeding, it was defaulted as untimely. But getting to the merit to the claim— You have to do cause and prejudice analysis, right? Right. So getting— You don't want to address that? Well, I mean, the cause and prejudice is going to flow right into the merit to the claim itself. All right. Okay, I can understand your argument. So there's a preliminary step in looking at this. What's fundamentally different about the way that they're kind of presenting this claim now? I originally understood this claim to be an Eighth Amendment challenge. What are we talking about? Now I don't know if you're—forgive me, but I really don't know. You've lost me. Are you talking about Judge Smith's procedural default? Are you talking about the merits of claim A? I'm talking about the merits of claim A now. Okay. Well, there's not necessarily a Stromberg problem per se. There's a two-step process to when you're dealing with a claim of instructional error here. Now what they're raising now is saying not that this—that the depravity instruction was insufficiently narrowed. It just improperly stated Nevada law on how to define the aggravator itself. Right? So they're raising a claim of state law error with respect to how to define the aggravator. And in that circumstance, Estelle v. McGuire applies. And when you apply Estelle v. McGuire, they have to show not just that the instruction was wrong. They have to show that there's a reasonable probability that the jury applied the instruction in an unconstitutional manner. The difficulty you've got if you really want to go down this path, I think, is then you run right into the evidence. And the probability that the—what I think was an erroneous instruction— I think the Nevada Supreme Court says it's an erroneous instruction. The probability that it was applied incorrectly then starts to really ratchet up. Because there were two victims and the jury was given a special verdict format to Christie that said you may only consider depravity. And the state argued very clearly to the jury that the reason that all three options were available vis-a-vis Wendy is because she was so much more seriously beaten. Correct. So the message was depravity requires a lesser showing. And I understand that's wrong. But the problem is since we're trying to figure out how this played out, it seems to me this cuts against you, sir. Right. So that's the preliminary question. That comes, though, before you get to the direct harmless error analysis. So the first thing I would say about the harmless error argument that they're making today under NIDA v. United States wasn't raised in a briefing. But that's a Chapman direct appeal standard of harmless error. That's not the standard of harmless error that you apply on habeas review. We're very squarely correct. What's your strongest argument on the merits? The strongest argument is that there's overwhelming evidence of mutilation here. I think the question I think the question we have to answer is framed up very clearly in Valerio. If the instruction was unconstitutional, we have to figure out whether the correctly charged jury. And we know what the correct charge was because Judge McGee sort of walked opposing counsel through that. I think it's meant to give us that. That's the instruction that should have been given. How can we be sure that the state has to give us a fair assurance that there wasn't a substantial injurious effect, that there isn't daylight between those two results?  If answering Judge McGee's question with respect to what the instruction should have looked like, according to the Nevada Supreme Court, is you removed the depraved physical abuse from the definition of the aggravator. Before you skip over that, forgive me, but before you skip over that, I got both answers from opposing counsel. Did the Nevada Supreme Court say that a finding of torture and mutilation was required or that there has to be evidence of torture and mutilation? I don't know specifically what they said. What's your position? I think they said both. Right. And so that again goes to... Here's why it matters, right? A finding of mutilation or torture would mean that the depravity is entirely surplusage in the statute. You would never need to find depravity if you found torture and mutilation. The aggravator would be satisfied. So it seems to me it must be evidence of mutilation, and there's evidence of mutilation in this case. Correct, Your Honor. Now get to, if you would, how do we know the jury would have made this mistake by misunderstanding that depravity requires less? How do we know that? What's my fair assurance, please? That because the state argued that depravity requires less, I mean, you still have the jury found mutilation. We don't know if it was unanimous. And so it's not a question of whether or not this actual jury found both or found mutilation unanimously. It's if we get rid of the error in the instructions, would a reasonable jury looking at the evidence that's appropriately instructed jury reach the same verdict? That is not the test. You're asking us to do a de novo review, and Valerio says we can't do that. The state appellate court could have done that. I disagree, Your Honor. I think that's what the Supreme Court case law addressing Brecht harmless error analysis on – So did you read Valerio? What's that? Did you read Valerio? I've read Valerio, yes, Your Honor. The question for us is whether the actual instruction had a substantial injurious – excuse me, substantial and injurious effect or influence on the jury's verdict in comparison to what the verdict would have been if the narrowed instruction had been given. Correct. So we have to compare the two. We don't just do the de novo. We have to do the comparison. That's right. So you have to – you take the evidence as it exists, as it was presented at trial, and assume that the jury was properly instructed as opposed to getting the erroneous instruction. And would they have still reached the same outcome? Right. And so your problem that you're still not grappling with is that in Christie's case, they were told – I think they clearly would have understood that depravity requires less. Okay. What's your view of what the instruction should have been? You agree that it was incorrect? According to – yes, that's what the Nevada Supreme Court said. It was unconstitutional. That's undisputable that the Nevada – not that it was unconstitutional, that it was wrong under state law. That doesn't render it unconstitutional. You think it was constitutional? That's the point of the Estelle argument. I understand. Are you standing there saying it was constitutional? Yes, I think it did adequately channel the jury's discretion. Okay. Which is why you think there wasn't a misapplication of Godfrey. Correct. Okay. So that's – the Godfrey question is different than the Estelle question about whether or not the instruction properly stated Nevada law. Okay. And so how would you have – what do you think the correct version of the instruction should have been? As I just said, and as the Nevada Supreme Court said here in Smith 2, is you would have to remove the depraved physical abuse from the definition. But I don't see that. I mean, it says Smith 2 highlighted that Robbins and other Nevada Supreme Court cases that Nevada adopted a narrow construction of depravity as, quote, requiring torture, mutilation, or other serious and deprived physical abuse beyond the act of killing itself. I don't understand the removing of that based on what specifically the Nevada Supreme Court has said. Maybe I'm reading this differently, but I understood that Robbins gave the narrowing instruction that you just talked about. Subsequent to that, and I think it's Jones, they removed the depraved physical abuse part of it and said that there either had to be evidence of mutilation or torture. They said they've never approved a depravity verdict without evidence of torture or mutilation. And in other places, they said they've always required a finding of torture or mutilation. Correct. So the answer to Judge McGee's question is do you think the instruction should have said what, please? So as long as you would take that instruction, the instruction 11. Let's look at instruction number 11. Instruction 11. Okay, do you have it there in front of you? Yeah. Okay, so tell me, you would keep the same first sentence? It's not opening up. Sorry, Your Honor. I don't know. Yes, so keep the first sentence, and then the second sentence would say, in order to find depravity of mind, you must find, you'd have to get rid of that serious depraved. I mean, you'd have to get, that part of the instruction just doesn't. Wouldn't you just simply insert, I mean, if you follow, you'd have to. That makes sense. You could let me finish. Sorry. Okay. Wouldn't you just insert, in order to find depravity of mind, you must find either torture or mutilation or serious and depraved physical abuse beyond the act of killing itself. Correct. Like, so you'd have to add in torture or mutilation into that. Right. And it would add it into what's there. Correct. Right. So then what would that mean? Well, what would that mean in terms of. Because that's what we have to determine whether or not, given the correct instruction, what would the jury do? I think the jury still would have found both the depravity and the mutilation. Because. Proven, because there's mutilation. There's overwhelming evidence of mutilation here. But. Okay, so I talked about this with the opposing counsel a bit, and I said here, in fairness, there's the ear, right, and then there's the number of strikes. What's the overwhelming evidence? I think on top of the ear is also, if you look at, and when you look at Dr. Sheldon, I think it's Sheldon Green's testimony from the autopsy, the description of the injuries is significantly different with respect to both Judith and Christy and Wendy. With Wendy, you have very clear, repeated blows to her that were done with the claw of a hammer, not with. Yes, we know that. But look at the definition of mutilation and tell us why it fits that, please. Because the prosecutor argued just one prong of it in closing. So it meets it. One, I mean, I think the ear clearly meets it. But, you know, I guess, you know, it doesn't fit as squarely as the ear being torn off with the claw of the hammer. But I think that the nature of these injuries radically altered her body beyond the fact of the killing itself. Let me go at this just a little bit differently, if I could. How many jurors found mutilation? Well, I don't know that the instruction, the verdict form actually says. So you don't know. To be clear, it doesn't say. It doesn't. It doesn't say. And just to be clear, were they polled? I don't think so. We're not trying. These are not trick questions. No, I don't think they were. OK. I'm not trying to be tricky. I'm just trying to understand what you're suggesting. Do I have any fair assurance that they unanimously found mutilation? I don't think that's the right question to ask. Well, you can say no, but then tell me what the right question is. I mean, the bottom line is I'm trying to figure out what you're really arguing to me. Are you arguing to me that this jury instruction was not right, no question, but because there was evidence of mutilation in the record, it nonetheless should be affirmed? Is that what you're arguing to me? Partially right, Your Honor. What are you arguing? I think that... And what case tells me I can get there? I'm trying to understand your argument because I was trying to get there that the Supreme Court of Nevada had found mutilation, no question. That's what the dissent found. You're not going there. You said there's nothing there. So I'm trying to say, how do I get there? What is your argument? Are you going to say, well, your jury instruction was wrong, but one could have found mutilation. Now tell me how I can affirm that jury verdict on that. That's the standard that both this court and the U.S. Supreme Court... Would have. No, would have. When there has to be unanimous agreement about it, and so I can find it on a could have, would have? Would have is the correct standard, Your Honor. If you look at the Supreme Court's case law applying... Will I substitute my own judgment for that? That's exactly correct, Your Honor. Is that what the Nevada Supreme Court did? The Nevada Supreme Court did not engage in a Chapman harmless error analysis, which was what they would have had to apply. But that's a different question about whether or not you would defer to the Nevada Supreme Court's harmless error analysis under Allah v. Davis. That's not at issue here. What I'm talking about is Brecht harmless error in the context of a claim of instructional error. Under the framework for determining harmless error in that case, you ask whether or not an appropriately instructed jury would have reached the same outcome based on the evidence that was presented at trial. So what's your best shot? That they would have. That's the question I was coming to. You stole it right out of my mouth. What's your best shot? Forgive me, but that's the question. Repeated physical abuse to her that had nothing to do with killing her. I mean, he nearly tore her ear off, hitting her with a hammer. You could look at the definition of mutilation. Now would be the time to look at the definition of mutilation, because that's what we have to decide. Whether they would have made a different conclusion. And they didn't. The prosecutor's argument in closing, which I'm looking at, says that it's in the disjunctive and he only, on page EOR-2263, only relies on the last phrase. He says the final phrase after the word or reads, quote, alter radically so as to make imperfect. And I challenge you, he's speaking to the jury, after you have viewed the autopsy photographs of Wendy Coughlin to any conclusion other than that her appearance, her body, her head, her ear was not altered radically so as to no longer make her the perfect young human being. She was before this murderous assault. That's the argument that they made. Are you making a different argument today? No, I think the evidence of that is supportive. Both the evidence of the ear being nearly torn off of her head. So it's not a Jackson analysis sufficiency. No. It's not a Jackson sufficiency of the evidence. You have to ask whether or not a reasonable jury would, not could. That's the Jackson standard. Jackson standard requires you making all inferences in favor of the state and asking whether the jury could do it. So do this one, please. Here you're supposed to step into the shoes of the jury and ask whether the jury would have reached the same outcome. And I think that both the evidence of her being beat so badly with a hammer that her ear was nearly torn completely off and also the fact that he turned the hammer around and was hitting her with the claw, the hammer, all over her, on both sides of her head, permanently disfigured her head. So now tell me why I shouldn't be concerned, if you would, about the fact that the jury was, I think, told, and admittedly this isn't a direct instruction. The judge made the ruling outside the presence of the jury, but juxtaposed against Christie. Why should I not be concerned that that depravity was treated essentially as a lesser included, that it requires less, that some fewer number of jurors chose depravity, please? Because the question that this court has to ask is if the error in the instructions is removed, what would the jury have done? It's not whether the jury actually relied on that wrong instruction. The standard is whether or not a properly instructed jury would reach the same conclusion. And I think that's what we're struggling with, and that seems to be an important point here. Thank you. I'm wondering, couldn't a juror who only found serious physical abuse but not mutilation under the improper depravity instruction look at the properly narrowed depravity instruction and concluded that no serious physical abuse existed? I think that's kind of, if I understand the court's correction, that kind of wraps around on itself, because you have to get... Why don't you listen to it one more time? I think it's a really great question, and I'd love to hear your answer. So, couldn't a juror who only found serious physical abuse but not mutilation under the improper depravity instruction look at the properly narrowed depravity instruction and concluded that no serious physical abuse existed? Could a juror have done that? Yes. A juror could have, but that's not the right question to ask. It's, what would the jury have done? So, the words mutilation and torture, adding that to the physical abuse on the depravity, because you say mutilation, torture, or physical abuse. I'm just trying to figure out, what does that mean now? It seems very confusing to me. And does it provide context in describing what the physical abuse is? Or does it have to be so that it rises to that level or exceeds it? Or is it duplicative of what they've already been given up above? That's kind of what I meant by it's kind of circular, is because you then wrap the mutilation and torture back into the definition of depravity. How do we have this fair assurance now that we know what the jury? Fair assurance that you have is that the jury was correctly instructed on what mutilation is. And there is overwhelming evidence of mutilation. Actually, that's not what the prosecutor argued. I mean, you've got to address that question because everything you've said here sounds good. But when I go back to the argument the prosecutor made to the jury, I didn't hear the prosecutor making that argument to them. So I'm having a tough time understanding how I get there. All you're saying is, the prosecutor can argue whatever he wants to argue. As long as mutilation is defined correctly, if you sit here on appeal and say there would have been mutilation based on that, you can affirm. Nobody argued it. Nobody presented it to the jury. But you could affirm nonetheless. I'm fairly certain that the prosecutor argued mutilation to the jury. Well, he argued mutilation and deprivation and all kinds of things. He argued that any blunt strike to Christy would have been mutilation. That? I don't think, I don't know if that's... I'm reading it. Like... Any blunt force trauma... There was no... On page 2261, any blunt force trauma amounts to serious and depraved physical abuse beyond the act of killing itself. This is saying that it didn't have to hit this child with a hammer. She was a little girl. That's not the mutilation... That's not the mutilation instruction or the definition of mutilation. That's talking about the depraved physical abuse part of the instruction. He's juxtaposing it. That's your problem that you're not grappling with. I don't think he's juxtaposing it. He's saying, with respect to Christy, all he had... What he needed to prove, because the jury wasn't... Or, excuse me, the court wasn't going to let him argue... If I could answer my question, I just want to really give you a fair chance. On page 2258, he said... Keep in mind, the allegation of torture is limited to Wendy. Why has the prosecution drawn that distinction? You haven't been privileged yet to see the photographs. The photographs were shown during the first time, and there was the outburst, very strong... Not an outburst, but there was a disruption, because very strong reaction to the photographs. And then he says... He explains why they made that distinction, and he talks about the autopsy photographs. I think he said he wasn't going to argue torture. That he was arguing the mutilation, not torture, to the jury. He argued torture and mutilation, and he's explaining why, as to Christy, they're only arguing depravity. Correct. And that was because the trial court did not allow for an instruction on mutilation or torture with respect to Christy. Because she suffered so many fewer blows. That's the point. Correct. And the seriousness of her injuries. But the injuries to Wendy very squarely, very comfortably fit in the definition of mutilation. And because there's overwhelming evidence of mutilation, you can be reasonably assured that had the jury been properly instructed as to what this aggravator meant, that the jury would have still found mutilation beyond a reasonable doubt. Stating your conclusion several times, and the overwhelming evidence you're looking at is the torn ear. Correct. The number of blows. I just really want to make sure we have your argument clear. What else is it, please? And the fact that he turned the hammer around and was striking her repeatedly with the claw of the hammer, rather than just the head of the hammer. This isn't just trying to knock her out to subdue her. He turned the hammer around and was repeatedly beating her both sides of the head with the claw of a hammer. If we determine that Mr. Smith's claim has merit, what would be the proper form of relief in your view? If the instructional error claim has merit? Correct. He would get a penalty phase relief. What does that mean? He would get a new penalty. The court would issue a conditional writ giving the state. Typically what the district court does in these situations, if they find that there was penalty phase error, they issue a conditional writ that gives the state the option of giving him a new penalty phase or imposing a lesser sentence than a capital sentence. Before your time is up, I want to ask you about the Martinez claim, please. There was no mental health evidence presented during Mr. Smith's mitigation case at the second penalty phase. I just wanted to ask you, how is that not prejudicial? I think the district court's analysis on the prejudice aspect of the claim is accurate. There's two questions to ask. One, is the jury going to even look at this evidence as mitigating at all? Judge Mahan found that it wasn't particularly mitigating to begin with. But even assuming the jury finds that it's mitigating, you still have to ask whether the jury is going to see that, if there's a reasonable probability that the jury is going to see that as outweighing the aggravating evidence in this case. There was only one aggravating factor, and there's no mental health evidence at all. There really wasn't much of a defense at all. It was another theory that was pursued. That's the problem, right? The other point that I would make is that under the deficient performance problem in Strickland, there's a very clear strategic reason why counsel didn't pursue this stuff. What is that? The public defender's office at the first trial had a competency evaluation performed. That evaluation goes far beyond just addressing the issue of competency and actually did a criminal responsibility analysis and found that he was competent at the time of the offense and that he had a mixed personality disorder with narcissistic, histrionic, and antisocial characteristics or features. That's very damaging evidence to try to present to a jury in a penalty phase hearing because those... The jury certainly was going to hear and did hear that he had engaged in a lot of really fraudulent conduct. So the argument from opposing counsel is that if they'd had some kind of diagnosis, they would have had some way to explain this pretty despicable behavior. What about that? One, I don't think it does explain the behavior. It's talking about him engaging in various financial transactions and stuff and having grandiose delusions about his ability to, you know, being a real estate schemer, but that doesn't explain the violent conduct that happened. But counsel, again, you're trading it off as though it could be strategic if the defense pursued a different theory at the penalty phase. They really didn't. Well, I would argue that the defense's theory was that the state didn't prove it the aggravator. That was Mr. Evans' approach. How could it be strategic if they didn't know the full aspect of his mental health? Nobody really, except for that competency evaluation, which was just superficial, and really that just goes to competency. It doesn't go to any other mental health issues, which the competency evaluation should have triggered. I wholeheartedly disagree that it was superficial, Your Honor. That was a full battery of psychological testing. It's a very different standard for competency evaluation. Two days. But I guess it's a very different standard, as Judge Chris was saying, for competency than for a mental health evaluation. And Dr. Hess said that he was, you know, that he was with it, competent, at the time of the offense. He did a criminal history evaluation there. But he said competency, right? True. So you understand the difference between competency and a mental health diagnosis that might be a disorder of some type. And that goes directly to Judge Mahan's analysis of why this evidence is not particularly mitigating, and that's because it does not actually explain the conduct here. And on top of that, as Your Honor pointed out, there's no actual diagnosis in any of this. There was no testing done by either of these experts. That doesn't help you. I think it does. No, I think it does. Because under this court's case law. You can let us, when we start to ask if you don't mind, just because I think it's important for you to answer our questions. That only goes with the question that I'm trying to figure out is deficiency. Because we have to see whether or not, do the review of whether or not his lawyers were deficient for not pursuing more mental health avenue here. And what you just said right now, why wouldn't that just show the deficiency on the part of the lawyers? It doesn't show deficiency because the actual doctor that they were relying on did testing and came to a completely different direction of where these other two experts are saying, without having done any testing, what they think he has. And on top of that, under this court's case law. I don't know which doctors you're talking about. Dr. Hess that did the original evaluation did two days of testing with. For competency. For competency, but did a full evaluation under the MMPI-2 and looked at this stuff and said he had mixed personality disorder with antisocial, narcissistic, and histrionic features. Doesn't it also say he's an intelligent individual without any serious cognitive or affective psychological disorder? It does. And on top of that, under this court's case law, to establish prejudice under Strickland with respect to the failure to call an expert at trial, you have to say what it is an expert would actually testify to during the hearing. There's no diagnosis here. Fontu has a much stronger basis for you. There's no diagnosis here that would demonstrate, that would explain this conduct. If there is no diagnosis, but we have these reports, doesn't that speak to the fact that we ought to have a hearing? I don't think it. My worry about your argument is it seems to me that you focus very carefully on there is no diagnosis. I thought your argument would be somewhat different. I thought it would be more about prejudice, rather than there was no diagnosis in those reports, so therefore it's not important. Because it seems to me that if I'm going to have a hearing, the reason I'm going to have a hearing is to allow more discovery and to determine if there was really cause, because that's what we're really talking about here, was there cause. And so therefore, I mean, I guess I'm trying to figure out, if your argument is there's no diagnosis, it seems to me it's obvious I need a hearing. My argument isn't just stuck on that there's no diagnosis. Okay, what is it? What's there? One, to establish prejudice, they have to get a hearing, Your Honor? To get a hearing, you have to determine that I want to have more discovery and want to have more looksy as to finding out whether there was cause. They've had an overwhelming opportunity to present that up until now, and all they've got is these two reports that don't make a lot, they don't deal with Dr. Hess's report. One that Dr. Love, her report addresses Dr. Hess's report and just says, oh, they just didn't even sufficiently deal with competency. She doesn't explain how her... What's the diagnosis in Dr. Love's report? There's not a diagnosis in Dr. Love's report. Oh, there's kind of a diagnosis. She says this is what I think, but I've never even met this guy. All she's done is looked at records. That's not... She has a delusional disorder of a grandiose nature, and she suggests that there could have been a psychotic break. I think the psychotic break comes from the other doctor. I don't think so. But either way... What do I make of this fact that Evans suggests he was going to do a psychological workup, but Smith refused? Fifteen-plus years after the offense, when you had a psych evaluation that was done very close in time to the offense itself, that reaches an actual diagnosis. But to say that, then, means that if somebody is competent, you can't later or at some subsequent point challenge the mental health aspect of it. Well, an important point about why it would be strategic not to start digging into that stuff is that once you've already got information that your client has an unfavorable mental health diagnosis that's going to very well work against him in the penalty phase... But there's so many red flags that were coming up. You have that competency evaluation, but you have all these things that he was doing in his criminal past that were relevant, and then that was happening during the course of this proceeding that seems that would have raised the specter of some concern on the mental health side here. There's two problems there. One, you've already had one expert who gave your client an unfavorable diagnosis. You don't get multiple experts. An indigent person doesn't get to shop around and choose their expert. They get their one expert to help with presentation and development of the defense. So they've got that. And the other problem is that even assuming they could have gone out to find another expert that would have given a favorable diagnosis, that then waives the Sixth Amendment privilege and the Fifth Amendment privilege against self-incrimination, and he's going to have to undergo a state-ordered psych evaluation to allow the state to present rebuttal evidence. The declarations of defense counsel indicate that's not the analysis they went through. I don't know if anybody else has any questions. I know you're over time, but I'll let you make a concluding statement unless somebody else has any questions. I think this court should affirm the judgment from below. I think there's overwhelming evidence on the mutilation, and so any error with the instruction was harmless under Brecht, and he just doesn't even show a substantial claim of ineffective assistance of counsel to get his evidentiary hearing under Martinez.  Thank you, Your Honor. We went over time with the state, so I'll give you five minutes here. Thank you, Your Honors. I did want to note that the jury was polled with respect to the verdict. That was to the aggravating factor, but not to the means itself. Not to the three. Not to the three, no. There was no polling to find out whether they were unanimous with respect to that. The state contends that Mr. Smith has had an overwhelming opportunity to provide evidence of his mental illness, but at all stages of this proceeding in federal habeas, the state has objected to any type of development of those facts. We lost this claim on the state's motion to dismiss Beck. And what do you make of the argument, then, that the competency evaluation was sufficient and enough to not hold the counsel as being ineffective? Well, counsel didn't rely on the Hess report. Penalty Retrial Counsel Donald York Evans said that he wanted to have a mental health workup done of Smith. He recognized these red flags, and that's what he wanted to, but apparently Mr. Smith had been reluctant to engage with a mental health expert. I think you can say that. He says he thought that Mr. Smith would be reluctant. I can't find any place where anybody ever says they asked Mr. Smith. Is that right? If that's what the declaration says, Your Honor, then I would rely on this. What does it mean to ER 3510? It seems to me, I looked right at it, and it says he was going to do, but it seems to me he's saying Smith refused to submit. Even if Smith refused to submit to mental health testing during the penalty retrial, that speaks more to Penalty Retrial Counsel's ineffectiveness than Smith's unwillingness to participate in a mental health examination. Smith participated during his first trial in a competency examination. He met with a mental health expert there, and then in these federal habeas proceedings, he met with one mental health expert here. The only time he showed reluctance to meet with a mental health expert was when he was represented by Mr. Evans. Mr. Evans, who did not meet with Mr. Smith for two months after appointment, it suggests that he failed to create the type of relationship that would have permitted Mr. Smith to trust him and to follow that course of action. So that would be my response to that, Your Honor. Those were the points that I'd hoped to make in rebuttal, unless there were any other questions. Anything else on the depravity instruction based on what Mr. Conner said? Well, Mr. Conner noted several times that he had a difficult time articulating why this court should have fair assurance, because he couldn't say that the jurors were unanimous with respect to mutilation. That is consistent with what our argument is exactly. That a juror could have doesn't mean that a juror did, in fact, in this case. So Mr. Smith may not have a single valid aggravating circumstance found by a jury, which is required under the laws of the state of Nevada.  Certainly, Your Honor. I'm looking at the declaration before I... It says on page 3510, the declaration of counsel. I want you to complete psychological workup on him. I discussed the idea with Joe, and he refused to submit to any testing. He insisted he was not crazy. So this is a different counsel than the one I was looking at. Is Judge Smith correct? It sounds like in this instance the defendant did flatly refuse. That really changes the playing field for me. Sorry, that... The other lawyers seem to indicate that they suspected, they didn't think, that Mr. Smith would cooperate. This person at page EOR 3510 says, I discussed the idea with Joe, and he refused to submit to any testing. And that is the declaration of Donald York Evans, who represented him at penalty retrial. If he really refused, how is it that counsel can be charged with IAC? This court has recognized that when a defendant is reluctant to, or forecloses an avenue of investigation, that that does not give a free pass to counsel to not investigate. In fact, in the capital context, this court has said that it may be even more important to investigate that. How do you investigate this particular defense when the defense requires testing by this defendant? There's other kinds of defendants in the context you're talking about. That sentence, that principle would make sense. But here, if he refuses, he refuses. Two points, Your Honor. First is that Dr. Lundberg-Love was able to reach opinions based on Mr. Smith's mental illness based exclusively on his social background and records. And a mental health expert could have done the same even without Smith's participation during the penalty retrial. Second, and I go back to... Well, actually, second is that Dr. Dudley concluded that had Mr. Evans been more engaging with Mr. Smith and not been out of the picture for the first two months, that there was time for Mr. Evans to get a mental health expert and work with Mr. Smith so that an evaluation could have been conducted. And that was in Dr. Dudley's examination. If I could just have one follow-up. How would these diagnoses that have been made suggest or explain the violent conduct that occurred here? Well, as this Court is aware, there is not a nexus requirement for evidence to be mitigating. But the point is that... But what would the argument have been as to why this was mitigating? Joe Smith suffers from mental illness that, as the district court recognizes, reduces his moral culpability and perhaps could have engendered sympathy for him. That this mental illness of a delusional disorder impacted his thought process, judgment and decision-making, such that... And when he's in a delusional state, that he is divorced from reality. That type of information, if heard by a juror, could have permitted them to determine that an individual who had never had any type of violent conduct in the past, something occurred. Something occurred, and that this evidence helps provide some type of explanation or give context to how somebody who had never had a violent past could commit such atrocious crimes, when everything else suggests that he had been a loving husband and stepfather providing for these children. Judge McKee, may I ask one more question? Yes. We held opposing counsel speak to the fire pre-hard, asking what is his strongest argument that the jury would have found mutilation? And we talked about the definition of mutilation, and I think he came down to that in Wendy's case, the ear was torn and she was hit with the claw end of a hammer, and she was hit 16 times. There's 32 puncture marks. What is your best response? That it was not beyond the act of killing itself, or... But the jury was instructed they had to find beyond the act of killing itself. And we know that at least one juror found mutilation beyond the act of killing itself, with respect to that checkbox. Okay. I'm really not answering your question because, and that's why I think it's a very good one, because if I'm going to be placed in the position, I'm not talking about could now, I'm not talking about what the Supreme Court of Nevada did or didn't do, I'm talking about putting me in the position, Would this be enough for mutilation? Your Honor, that sounds, I mean, again, it sounds close to a sufficiency analysis. And the question for this court would be that... It's not a sufficiency analysis because we're not under a sufficient prong. We're on the fact of we've got an instruction which is constitutionally wrong. Everybody seems to be admitting, so what is my standard of what I have to do in that instance? Seems to me, counsel and you have said, I put myself now, is there enough evidence or would the jury have found based on this evidence? Your Honor, I guess I'd direct the court to Hedgepeth, the United States Supreme Court case in Hedgepeth, which was a Ninth Circuit case that said, in instances of strong error, there needs to be absolute certainty that the jury didn't rely on an invalid theory. Absolute certainty suggests a higher standard than whether or not a juror could or would have found the specific means. Thank you, Your Honors. Thank you, Mr. Fitzgerald, Mr. Conner. Thank you for your oral argument presentations here today. We are adjourned. Thank you. All rise.
judges: N.R. Smith, Murguia, Christen